UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

AERO FULFILLMENT SERVICES                          Case No. 1:15-cv-287
CORPORATION,
                                                   Judge Timothy S. Black
            Plaintiff,

vs.

ORACLE CORPORATION, *et al.*,

            Defendants.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS (Doc. 32)

This civil action is before the Court on Defendants'[1] motion to dismiss (Doc. 32)

and the parties' responsive memoranda (Docs. 37, 41).[2]

## I.      FACTS AS ALLEGED BY THE PLAINTIFF

For purposes of this motion to dismiss, the Court must: (1) view the complaint in

the light most favorable to the Plaintiff; and (2) take all well-pleaded factual allegations

as true. *Tackett v. M&G Polymers*, 561 F.3d 478, 488 (6th Cir. 2009).

### A.      Purchase of the "Open Commerce Platform"

Plaintiff Aero is a small business founded in 1986 and located in Mason, Ohio.

(Doc. 23 at ¶¶ 1, 8). Aero provides e-commerce services to businesses that sell or

---

[1] Defendants include Oracle Corporation, Micros Systems, Inc. ("Micros"), and Fry, Inc. (collectively "Defendants").

[2] Defendants request oral argument. (Doc. 32 at 1). The Court finds that the pleadings are clear on their face, and that oral argument is not necessary. *See Whitescarver v. Sabin Robbins Paper Co.*, Case No. C-1-03-911, 2006 U.S. Dist. LEXIS 51524, at *7 (S.D. Ohio July 27, 2006) (J. Dlott) ("Local Rule 7.1(b)(2) leaves the court with discretion to grant a request for oral argument.").

distribute items online.  (*Id.*)  Among other things, Aero helps its customers take and fulfill orders, including providing technical solutions for order processing and fulfillment. (*Id.* at ¶ 8).[3]  In 2012, Aero bought a software program called the Open Commerce Platform "OCP" from Defendant Micros.  (*Id.* at ¶ 11).  The License Agreement and the Amendment to the Intellectual Property License and Maintenance Agreement govern that purchase.  (*Id.* at ¶¶ 50-51, Ex. C).

 "Source code" is the actual, human-readable programming language that makes up the software.  Aero alleges that this "Open" characteristic of the OCP included the original program and "updates" that would be released from time to time.  (Doc. 23 at ¶¶ 24, 45-49, 55-58).  Aero claims that Micros assured Aero that the purchase of the OCP included source code.  (*Id.* at ¶¶ 31-49).  In fact, source code and its updates were provided on multiple occasions from 2012-2014.  (*Id.* at ¶¶ 53-58).

### B.    Aero Needed the Source Code

The OCP is an "e-commerce" software product that could do some of the things that Aero wanted to provide for its customers, but not everything.  (Doc. 23 at ¶¶ 12, 23, 39-40, 43, 45, 48).  Aero bought the OCP intending to make a customized "portal" that would provide additional functions not offered by the OCP.  (*Id.* at ¶¶ 23, 31, 42, 46). Aero needed source code so that its programmers could make their customizations work. (*Id.* at ¶¶ 40, 43, 45).  Aero also needed source code for OCP updates.  Without source

---

[3] For example, a retailer might go to Aero for assistance in selling its products online and shipping them to customers.  (Doc. 37 at 2).

code, Aero could not ensure that its customizations would continue to work reliably.  (*Id.* at ¶¶ 24, 40).

Aero allegedly told Micros and its executive, Chris Sarne, about Aero's plans to customize the OCP to meet the needs of third-party business customers.  (Doc. 23 at ¶¶ 25, 38-48, 53-54, 56-57).  Aero claims that this attracted Mr. Sarne to the project as a way to reach new market segments.  (*Id.* at ¶ 47).  Micros allegedly provided source code for the OCP and its updates on multiple occasions from 2012-2014.  (*Id.* at ¶¶ 53-58).

### C.     Oracle/Micros Refuse to Provide Source Code

In early 2015, Defendants Oracle and Micros, the providers of the OCP, refused to give Aero source code for the next update of the program.[4]  (Doc. 23 at ¶¶ 59-60).  Defendants claimed that Aero had never purchased or received source code.  (*Id.* at ¶ 61).  Aero maintains that the abrupt refusal, which was a total reversal of the parties' prior dealings, caused a great deal of harm and forced it to act quickly to find another solution.  (*Id.* at ¶¶ 62-66).  Aero had just spent two years customizing and integrating the OCP at great expense.  (*Id.*)

Defendants argue that none of the agreements governing the parties' relationship contain any provision granting Aero source code for the OCP software as part of its license purchase.  (*See* Doc. 23, Exs. A-C).  Furthermore, Defendants maintain that Aero fails to cite any contractual requirement that they turn over source code.

---

[4] Oracle acquired Micros in late 2014.  (Doc. 37 at 2, fn 1).

Aero alleges claims for: (1) breach of contract; (2) breach of implied-in-fact contract; (3) fraud in the inducement; (4) fraud; (5) negligent misrepresentation; (6) promissory estoppel; and (7) violation of the Ohio Deceptive Trade Practices Act. (Doc. 23).  Defendants move the Court to dismiss each of these causes of action for failure to state a claim.

## II.     STANDARD OF REVIEW

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) operates to test the sufficiency of the complaint and permits dismissal of a complaint for "failure to state a claim upon which relief can be granted."  To show grounds for relief, Fed. R. Civ. P. 8(a) requires that the complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief."

While Fed. R. Civ. P. 8 "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).  Pleadings offering mere "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Id*. (citing *Twombly*, 550 U.S. at 555). In fact, in determining a motion to dismiss, "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation[.]'"  *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265 (1986)).  Further, "[f]actual allegations must be enough to raise a right to relief above the speculative level[.]"  *Id*.

4

Accordingly, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678. A claim is plausible where "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. Plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief,'" and the claim(s) shall be dismissed. *Id*. (*citing* Fed. Rule Civ. P. 8(a)(2)).

## III.    ANALYSIS

### A.    Breach of Contract (Count I)[5]

First, the Court must determine whether the contract is ambiguous. "If a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined." *Inland Refuse Transfer Co. v. Browning-Ferris Indus. of Ohio, Inc.*, 474 N.E.2d 271, 272 (Ohio 1984). "A court's primary objective in interpreting a written contract is to ascertain the intent of the parties as expressed in the terms of the agreement." *Hamilton Ins. Servs. v. Nationwide Ins. Cos.*, 714 N.E.2d 898 (Ohio 1998).

---

[5] Defendants do not dispute that Aero has pleaded the elements of a breach of contract claim. Instead, Defendants argue that the plain terms of the contract preclude Aero's breach of contract claim. (Doc. 41 at 4).

Aero alleges that because the License Agreement was for software called Serenade (owned by Defendants), and the Amendment was for OCP (the software at issue), the Amendment deleted Section 12 of the License Agreement which references source code, because the Amendment did not expressly reference Section 12. Accordingly, the OCP Amendment requires Defendants to provide source code.

The term "source code" is specifically and solely addressed in Section 12 of the License Agreement. (Doc. 23, Ex. A at § 12). Section 12 provides for an unambiguous mechanism through which source code would be provided to Aero in a specific circumstance not found here. (*Id*.)[6] The Amendment expressly incorporates the License Agreement through an integration clause, with the exception of any contradictory provisions. (*Id.*, Ex. C). There is no conflict between the Amendment and the License Agreement, because source code is not addressed in the Amendment. Therefore, Section 12 governs the provision of source code. *Christe v. GMS Mgmt. Co.*, 705 N.E.2d 691, 693 (Ohio 1997) ("Where one instrument incorporates another by reference, both must be read together.").

First, Aero argues that, on its face, "Open Commerce Platform – Base" is amenable to the interpretation that source code is included. Specifically, Aero

---

[6] The License Agreement grants Aero access to source code under very limited circumstances. Pursuant to the Agreement, three threshold events must occur in order for Aero to gain a right to obtain source code: (1) Aero has to enter into an escrow agreement with Defendants; (2) Micros has to cease doing business; and (3) Aero has to make a written request with an affidavit to the escrow agent setting forth that Micros has ceased doing business. (Doc. 23, Ex. A §§ 12.1, 12.2). None of these events have occurred.

understood "Open Commerce Platform" to mean that Aero was getting source code, because Micros advertised the OCP as "Open," meaning that source code would be provided, and because Micros repeatedly supplied source code in the course of dealings between the parties.  (Doc. 23 at ¶¶ 24, 31-33, 39-46, 48-49, 53-58).  The Court finds, as a matter of law, that "Open Commerce Platform—Base" is not amenable to the interpretation that source code is included.  Nowhere in the Agreement does it state that source code will be provided.   "Open Commerce Platform—Base" is simply the name of the product and therefore it requires no definition and cannot be construed as ambiguous.

Second, Aero argues that the definition of "[u]pdates" refers to matters outside the written agreement.  Aero maintains that there is no way to determine the meaning of "Updates" without looking into the facts regarding what "MICROS-Retail generally provides to its then-current Clients without additional payment."  (Doc. 23, Ex. C at 3).  However, "[u]pdates," is defined by the OCP as "updates, improvements or revisions to the Licensed Software that MICROS-Retail generally provides to its then-current Clients without additional payment."  (*Id*.)  "Updates," as defined, is strictly limited "to the Licensed Software."  (*Id.*)  Accordingly, under the plain language of the agreement, "[u]pdates" do not apply to source code.[7]

---

[7] Additionally, Areo argues that despite asserting that "source code" is not ambiguous and has an established industry meaning, Defendants concede that the phrase is ambiguous because they object to Aero's use of the term, undefined, in the Requests for Admissions ("RFAs").  (Doc. 37, Ex. 1).  However, Defendants only objected to Aero's use of the undefined term in the RFAs because *Aero* maintained that the term was vague and ambiguous, not because the term is actually ambiguous.  Accordingly, this does not render the term ambiguous as a matter of law.

Aero's arguments regarding the parties' intentions and course of conduct are irrelevant to the breach of contract claim.  Where a contract's terms are clear and unambiguous, no interpretation or construction is necessary, and terms will be given the effect called for by the plain language of the contract.  *See O'Neill v. Kemper Ins. Cos.*, 497 F.3d 578, 582 (6th Cir. 2007).  Aero, an admittedly sophisticated e-commerce service provider, actively negotiated and bargained for the terms of both the License Agreement and the Amendment.  (Doc. 23 at ¶¶ 17-58).  Where both parties are commercial enterprises, as they are here, Ohio courts presume that they possess "a high degree of sophistication in matters of contract."  *Glaspell v. Ohio Edison Co.*, 505 N.E.2d 264, 267 (Ohio 1987).

Moreover, the Agreement is fully integrated and therefore Aero's argument that it "flies in the face of the parties' dealings and history" may not be considered.  (Doc. 37 at 9).

> The rule as applied to contracts is simply that as a matter of substantive law, a certain act, the act of embodying the complete terms of an agreement in a writing (the 'integration'), becomes the contract of the parties…Extrinsic evidence is excluded because it cannot serve to prove what the agreement was, this being determined as a matter of law to be the writing itself…[P]rior and contemporaneous negotiations, oral or written, are excluded; or, as it is sometimes said, the written memorial supersedes these prior or contemporaneous negotiations.

*Galmish v. Cicchini*, 734 N.E.2d 782, 780 (Ohio 2000) (finding that an integrated agreement was unambiguous, and therefore extrinsic evidence was not considered to

understand the rights and obligations of the parties).[8] Accordingly, as a matter of law, this Court cannot consider Aero's claims that Defendants "told" or "assured" it that the OCP purchase included source code, because the plain language of the contract is unambiguous.[9]

Accordingly, Aero's breach of contract claim fails as a matter of law.

## B. Breach of Implied-in-Fact Contract (Count II)

In the alternative to the express contract claim, Aero argues that the parties formed a separate implied-in-fact agreement governing the provision of source code for the OCP. (Doc. 23 at ¶¶ 81-86).[10] Aero maintains that Micros provided source code repeatedly and voluntarily, and Aero relied on that conduct to customize the OCP at great expense and effort. (*Id.* at ¶¶ 53-58, 62-66). Since the License Agreement is silent on these

---

[8] In *Smith v. The Great Atlantic & Pacific Tea Co., Inc.*, appellee argued that the language of the contract was ambiguous based on the subsequent conduct of the parties and therefore that conduct should be interpreted by the court to determine what the parties actually intended. No. 88-P-2002, 1990 Ohio App. LEXIS 2721, at *9-10 (Ohio App. June 29, 1990). The court held that "[t]his is circular logic. Ambiguity is determined from the language of the document itself. The language in the original lease is clear on its face, so it is not necessary to look beyond the lease to determine the parties' intentions." *Id.* at 10. As the Supreme Court of Ohio stated in *Kelly v. Medical Life Insurance Company*, "[a] court will resort to extrinsic evidence in its effort to give effect to the parties' intentions only where the language is unclear or ambiguous, or where the circumstances surrounding the agreement invest the language of the contract with a special meaning." 509 N.E.2d 411, 413 (Ohio 1987).

[9] Moreover, the Agreement contains both a no-oral-modification clause (Doc. 23, Ex. A. at § 13.10) and an independent provision barring oral waiver of the Agreement's term. (*Id.* at § 13.4). Ohio courts routinely accept and enforce anti-waiver positions. *Ford Motor Credit Co. v. Ryan*, 939 N.E.2d 891, 925 (Ohio App. 2010) ("Typically, Ohio courts enforce antiwaiver clauses according to their terms.").

[10] Aero concedes that it cannot seek a recovery for both breach of the written contract and breach of an implied-in-fact contract. (Doc. 37 at 14).

circumstances, Aero maintains that the parties' conduct formed an implied-in-fact contract governing the new relationship. (*Id.* at ¶¶ 81-86).

"A contract implied-in-fact is a contract inferred from the surrounding circumstances, including the conduct and statements of the parties, which lead to a reasonable assumption that a contract exists between the parties by tacit understanding." *Keybank Nat'l Ass'n v. Mazer Corp.,* 935 N.E.2d 428, 435(Ohio App. 2010). Defendants argue that Ohio law expressly forbids pleading an implied-in-fact contract where there is a valid, enforceable agreement between the parties. "[A]lleging a cause of action that is legally invalid is not pleading in the alternative, it is pleading in the impossible." *Waltherr-Willard v. Mariemont City Sch.*, No. 1:12cv476, 2013 U.S. Dist. LEXIS 4152, at *12 (S.D. Ohio Jan. 9, 2013) (*aff'd sub nom. Waltherr-Willard v. Mariemont City Sch.*, 601 F. Appp'x 385 (6th Cir. 2015)) (since there was an enforceable agreement between the parties dealing with the same subject at issue, the court rejected the plaintiff's argument that the implied-in-fact claim was an alternative theory to its breach of contract claim and dismissed that claim).

However, as this Court has already determined *supra* in Section III.A, there is not an express agreement requiring Defendants to provide source code with the purchase of the OCP software. Since there is not an enforceable agreement between the parties dealing with source code, Aero has alleged a claim for breach of implied-in-fact contract.

### C.     Fraud (Count III) and Fraud-In-The Inducement (Count IV)

Aero argues that if source code was not included in the purchase agreement for the OCP, Aero was defrauded, and fraudulently induced to enter into the contract, because Aero was told that source code was included.

#### 1.     Pleading both contract and tort claims

Under Ohio law, "the existence of a contract generally excludes the opportunity to present the same case as a tort claim." *Wolfe v. Cont'l Cas. Co.*, 647 F.2d 705, 710 (6th Cir. 1981) ("We recognized that a tort exists only if a party breaches a duty which he owes to another independently of the contract, that is, a duty which would exist even if no contract existed."). The law prohibits a plaintiff from asserting a tort claim based upon the same actions as those that form a claim for breach of contract, unless the alleged breaching party also breaches a separate duty. *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 684 N.E.2d 1261, 1270 (Ohio App. 1996).

Fraudulent inducement involves a general duty to avoid wrongful conduct that induces a party to enter into a contract. *Mesaros v. FirstEnergy Corp.*, No. 5:04cv2451, 2005 U.S. Dist. LEXIS 22558, at *8 (N.D. Ohio Oct. 5, 2005). "[C]ontracts, in contrast, impose only duties to meet specific obligations enumerated therein." *Onyx Env't Servs., LLC v. Maison*, 407 F. Supp. 2d 874, 879 (N.D. Ohio 2005). Accordingly, when one induces another to enter a contract through misrepresentations, there is a separate wrong, a tort that is distinct from claims based upon the contract itself. A fraudulent inducement

11

claim may relate to contractual duties, but this does not transform the claim to one for breach of contract:

> The fundamental difference between tort and contract lies in the nature of the interest to be protected. Tort actions are created to protect the interest in freedom from various kinds of harms. The duties of conduct which give rise to them are imposed by law, and are based primarily on social policy, and not necessarily upon the will or intention of the parties…Contract actions are created to protect the interest in having promises performed. Contract obligations are imposed because of conduct of the parties manifesting consent and are owed only to specific individuals named in the contract.

Prosser, Torts, § 92 at 613 (4th ed. 1971). A tort claim can proceed where "the facts of the case show an intentional tort committed independently, but in connection with a breach of contract…" *Burns v. Prudential Sec., Inc.*, 857 N.E.2d 621, 646 (Ohio App. 2006).

Here, the Court finds that Aero's fraud and fraudulent inducement claims involve duties separate from those created by the Agreements.[11]

---

[11] Additionally, Micros contends that the tort claims must be dismissed because they require separate, actual damages resulting from tortious conduct, and Aero has failed to allege any such independent damages. However, it would be inconsistent to find that negligent misrepresentation claims survive the economic loss doctrine while claims for fraud or fraudulent inducement do not. *See infra* Section III.D. While the economic loss doctrine prevents a party from recovering in tort for breach of duties assumed only by contract, "fraudulent inducement involves a general duty to avoid wrongful conduct that induces a party to enter into a contract." *Onyx Envtl. Servs.*, 407 F. Supp.2d at 879 (finding that because fraud and contract duties are distinct from one another, the economic loss doctrine does not bar plaintiff's fraud claim).

## 2.        Misrepresentations of Fact and Intent to Defraud

"[A] claim of fraud in the inducement arises when a party is induced to enter into

an agreement through fraud or misrepresentation … A classic claim of fraudulent

inducement asserts that a misrepresentation of facts outside the [agreement] or other

wrongful conduct induced a party to enter into the [agreement]." *Am Coal Sales Co. v.*

*N.S. Power Inc.*, No. 2:06cv94, 2009 U.S. Dist. LEXIS 13550 (S.D. Ohio Feb. 23, 2009).

To prove fraudulent inducement, a plaintiff must demonstrate the same elements

necessary to prove a traditional action for fraud, including: (1) a representation, or where

there is a duty to disclose, concealment of fact; (2) which is material to the transaction at

hand; (3) made falsely, with knowledge of its falsity, or with such utter disregard and

recklessness as to whether it is true or false that knowledge may be inferred; (4) with the

intent to mislead another into relying on it; (5) justifiable reliance; and (6) a resulting

injury. *Micrel, Inc. v. TRW, Inc.*, 486 F.3d 866, 874 (6th Cir. 2007).

As a general rule, a fraud claim "cannot be predicated upon promises or

representations relating to future actions or conduct." *Tibbs v. Nat'l Homes Constr.*

*Corp.*, 369 N.E.2d 1218, 1222 (Ohio App. 1977).  However, an exception exists "where

an individual makes a promise concerning a future action, occurrence, or conduct and, at

the time he makes it, has no intention of keeping the promise." *Williams v. Edwards*, 717

N.E.2d 368, 374 (Ohio App. 1998).  A claim of fraudulent inducement typically involves

"a misrepresentation of facts outside the contract or other wrongful conduct [inducing] a

party to enter into the contract.  Examples include a party to a release misrepresenting the

13

economic value of the release claim, or one party employing coercion or duress to cause the other party to sign an agreement." *ABM Farms, Inv. v. Maust*, 692 N.E.2d 574, 578 (Ohio 1998). In other words, the claim involves some collateral misrepresentation designed to induce the plaintiff to enter into the contract. *Wall v. Planet Ford, Inc.*, 825 N.E.2d 686, 694 (Ohio App. 2005) (for example, termite inspector falsely representing that a house is infested with termites in order to induce the homeowner to enter into a pest control contract).

Aero claims that Defendants represented that the purchase of the OCP software included source code. (Doc. 23 at ¶¶ 23-52). Specifically, Aero alleges that it: (1) communicated to Micros its need to build customized features for its clients (*Id.* at ¶ 22); (2) in response to this request, Micros discussed an e-commerce solution called the Open Commerce Platform (*Id.*); (3) a Micros executive, Chris Sarne, told Aero that he had gotten approval to "go after [Aero's] market segment," *i.e.*, the third-party provider to other downstream businesses (*Id.* at ¶ 25); (4) Micros's employees assured Aero that it would be able to perform customizations that would interact with the OCP's source code and would be provided with the assets necessary to perform the customizations and keep them functional (*Id.* at ¶ 40); (5) Micros told Aero that OCP was specifically designed to make it easy to upgrade, even when custom developments had been added by the customer (*Id.* at ¶ 43); (6) Micros understood Aero was a third-party fulfillment company and that if Aero purchased the OCP, Micros would create a portal and package the OCP for Aero's clients in a customized and integrated way (*Id.* at ¶ 46); and (7) Micros

14

represented to Aero in or around March 2012 that purchasing the OCP would include provision of the source code for OCP and its updates or upgrades as part of the product (*Id.* at ¶ 49).

Aero alleges that the actions of Oracle/Micros amounted to a "bait and switch" scheme regarding the OCP. (Doc. 23 at ¶ 63). Aero makes additional allegations about Micros's intent at the time of the misrepresentations, including that they were made "with knowledge of their falsity or utter disregard and recklessness as to falsity, with an intent to mislead Aero…" (*Id.* at ¶¶ 91, 98). Specifically, Defendants told Aero in 2012 that source code was part of the OCP purchase, but in 2015 Defendants told Aero that they would never provide source code and "this is how it has always been from day 1." (Doc. 23 at ¶ 61; Doc. 37, Exs. 2-3). Accordingly, Aero maintains that Micros represented that source code was included in the OCP purchase while knowing that was a not true.[12]

Therefore, viewing the complaint in the light most favorable to Aero, it has alleged that Defendants made misrepresentations collateral to the Agreements. Here, the tort claims arise from conduct that occurred prior to contract formation. These

---

[12] If the "premise underlying [the] tort claims was the alleged failure to fulfill a contractual promise, and not any material misstatement of fact, we find these claims insupportable as a matter of law." *Telxon Corp. v. Smart Media of Delaware, Inc.*, Nos. 22098, 22099, 2005 Ohio App. LEXIS 4475, at ¶ 38 (Ohio App. Sept. 21, 2005). This case is distinguishable from *Telxon* because Aero's claims fall into the exception of the general rule. *See, e.g., Eggert Agency, Inc. v. NA Mgmt Corp*, No. C2-07-1011, 2008 U.S. Dist. LEXIS 90830, at *7 (S.D. Ohio Aug. 12, 2008) (the Edwards exception applies where collateral promises were made to induce plaintiffs to enter into a stock purchase agreement).

allegations are sufficient to plead misrepresentations of fact and fraudulent intent.[13]

### 3. *Particularity*

Rule 9 of the Federal Rules of Civil Procedure requires a plaintiff to plead "with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy the particularity requirement of Rule 9(b), a plaintiff who brings a fraud claim must generally "allege the time, place, and content of the alleged misrepresentations on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *United States ex rel. Marlar v. BWXT Y-12 LLC*, 525 F.3d 439, 444 (6th Cir. 2008). "Rule 9(b)'s additional pleading requirements should not be read to defeat the general policy of simplicity and flexibility in pleadings contemplated by the Federal Rules." *Spears v. Chrysler, LLC*, No. 3:08cv331, 2011 U.S. Dist. LEXIS 12014, at *15 (S.D. Ohio Feb. 8, 2011). "The Sixth Circuit has explained that '[s]o long as a [party] pleads sufficient detail—in terms of time, place and content, the nature of a defendant's fraudulent scheme, and the injury resulting from the fraud—to allow the defendant to prepare a responsive pleading, the requirements of Rule 9(b) will generally be met." *MyVitaNet.com v. Kowalski*, No. 2:08cv48, 2008 U.S. Dist. LEXIS 57745, at *14 (S.D. Ohio July 29, 2008) (citing *United States v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir. 2008)).

Aero alleges numerous specific fraudulent misrepresentations made by Micros and

---

[13] "[I]ntent may be averred generally." *In re Nat'l Century Fin. Enters., Inv. Litig.*, 504 F. Supp.2d 287, 318 (S.D. Ohio 2007).

its personnel, including who made the statements, to whom, and approximately when the statements were made. *See supra* at Section III.C.2. Furthermore, Aero claims that it reasonably relied on Defendants' misrepresentations to its detriment by paying Defendants for the OCP and continuing annual maintenance fees related to the OCP, and also by expending significant financial resources and effort to customize. (Doc. 23 at ¶¶ 50-66). Aero maintains that the customizations set it back three years. (*Id.* at ¶¶ 64-65, 67). Therefore, Aero pleads fraud with the requisite particularity.

Accordingly, Aero states causes of action for fraud and fraud in the inducement.

### D. Negligent Misrepresentation (Count V)

The tort of negligent misrepresentation provides a vehicle by which a party may recover economic damages that arise from the breach of a contractual duty. *Westfield Ins. Co. v. HULS Am., Inc.*, 714 N.E.2d 934, 951 (1998). The elements of negligent misrepresentation are as follows: (1) the defendant supplied false information; (2) in the course of his business, profession, or employment, or any other transaction for which he has a pecuniary interest; (3) that caused pecuniary loss to the plaintiff; (4) justifiable reliance; and (5) the defendant failed to exercise reasonable care or competence in obtaining or communicating the information at issue. *Delman v. City of Cleveland Heights*, 534 N.E.2d 835, 838 (1989).

Aero maintains that Defendants supplied false information in their business transactions, and failed to exercise reasonable care or competence—and Aero reasonably relied on the information and suffered loss. (Doc. 23 at ¶¶ 101-105). For these reasons

and the reasons stated *supra* in Section III.C.1 (*i.e.*, this claim is based on a duty independent from the contract), Aero states a claim for negligent misrepresentation.[14]

### D.    Promissory Estoppel (Count VI)

A promissory estoppel claim under Ohio law is comprised of four elements: "(1) a clear, unambiguous promise; (2) reliance upon the promise by the person to whom the promise is made; (3) the reliance is reasonable and foreseeable; and (4) the person claiming reliance is injured as a result of reliance on the promise." *Pappas v. Ippolito*, 895 N.E.2d 610, 622 (Ohio App. 2008).

Aero alleges that Micros promised that it would provide the OCP source code and updates and Aero relied on this promise when it entered into Agreements with Micros. (*See supra* Section III.C.2). Defendants argue that Aero's promissory estoppel claim is a simple recasting of its breach of contract claim and therefore it should be dismissed. "Ohio law does not recognize a claim for promissory estoppel that contradicts the express terms" of a valid contract. *Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 377 (6th Cir.

---

[14] This Court has declined to extend the economic loss doctrine to negligent misrepresentation claims. *J.F. Meskill Enters., LLC v. Acuity*, No. 05-cv-2955, 2006 U.S. Dist. LEXIS 41491, at *15-16 (N.D. Ohio Apr. 7, 2006). "[A]lthough tort claims are generally barred by the economic loss doctrine, the discrete tort generally referred to as negligent misrepresentation is not." *Id.* at 12. *See also Lee v. Dublin Manor Corp.*, No. 2:06cv533, 2007 U.S. Dist. LEXIS 56703, at *19 (S.D. Ohio Aug. 3, 2007) (denying a motion for a dismissal under Rule 12(b)(6) because "Ohio courts generally do not apply the economic loss rule to preclude negligent misrepresentation claims").

1999).[15]  However, Defendants argue, and this Court has found, that the OCP

Amendment and License Agreement do not address a situation where source code is

provided outside of a detailed escrow arrangement.  (*See supra* Section III.A).

Accordingly, Defendants' alleged promise that Defendants would provide source code

and its updates as part of the OCP purchase is *not* governed by a valid and enforceable

contract.  Therefore, Aero states a claim for promissory estoppel.

> ### E.      Violation of the ODTPA (Count VII)

The Ohio Deceptive Trade Practices Act ("ODTPA") establishes a right to sue for

statements that are "misleading" even if they are not "literally false."  Ohio Rev. Code

§ 4165.01.  "Where claims are made under the Ohio common law and [the ODTPA],

Ohio courts are to apply essentially the same analysis as that applied in assessing the law

of unfair competition under the federal statutes."  *Best v. AT&T Mobility, LLC*, No.

1:12cv564, 2015 U.S. Dist. LEXIS 30866, at *19-20 (S.D. Ohio Mar. 12, 2015).[16]

Aero alleges that Defendants made false statements about the quality and character

of the product they were selling, claiming that it included source code when it did not,

---

[15] *See also Waltherr-Willard*, 2013 U.S. Dist. LEXIS 4152 at 8 ("promissory estoppel is not available as a remedy where the legal relationship between the parties is governed by a valid and enforceable contract.").

[16]  *See also HER Inc. v. RE/MAX First Choice, LLC*, 468 F.Supp.2d 964, 979 (S.D. Ohio 2007) ("[A]n analysis appropriate for a determination of liability under…the Lanham Act is also appropriate for determining liability under the [ODTPA].").

in violation of Ohio Revised Code Section 4165.02(A)(7)[17] and (A)(9).[18]  (Doc. 23 at

¶¶ 115-116).  Defendants argue that an action does not lie for an "implied

representation."  (Doc. 32 at 16 fn. 8).  However, Aero alleges that Micros held the OCP

out as something that it literally was not.  (Doc. 23 at ¶¶ 24, 32, 115-116).[19]

Accordingly, Aero states a claim for violation of the ODTPA.

## IV.   CONCLUSION

For these reasons, Defendants' motion to dismiss (Doc. 32) is **GRANTED IN**

**PART AND DENIED IN PART**.  Specifically, Plaintiff's breach of contract claim

(Count I) is dismissed as a matter of law.

**IT IS SO ORDERED**.

Date:  5/16/16                                                            *s/ Timothy S. Black*
                                                                         Timothy S. Black
                                                                         United States District Judge

---

[17] "Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have."  (*Id.*)

[18] "Represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, of they are of another." (*Id.*)

[19] *See also, Action Group Int'l, LLC v. AboutGolf, Ltd*, No. 3:10cv2132, 2011 U.S. Dist. LEXIS 46133, at *23-24 (N.D. Ohio Apr. 29, 2011) (distributor sufficiently pleaded a claim under the ODTPA Sections (A)(7) and (A)(9) against a manufacturer because the distributor alleged the manufacturer represented that it was developing products and product enhancements that it knew or should have known would not be available by the dates it represented and were therefore vaporware at the time of the representation, and the distributor repeated the representations to its customers and thereby incurred damages).